Brian Litmans (AK Bar No. 0111068)
Katherine Strong (AK Bar No. 1105033)
TRUSTEES FOR ALASKA
1026 W. Fourth Avenue, Suite 201
Anchorage, AK 99501
Phone: (907) 276-4244
Email:   blitmans@trustees.org
          kstrong@trustees.org

*Attorneys for SalmonState, Alaska Center, Alaska Community Action on Toxics, Alaska Wilderness League, Cook Inletkeeper, Defenders of Wildlife, Friends of McNeil River, McNeil River Alliance, National Parks Conservation Association, National Wildlife Federation, Sierra Club, and Wild Salmon Center*

Jacqueline M. Iwata (*Pro Hac Vice* admission pending)
NATURAL RESOURCES DEFENSE COUNCIL
1152 15th Street, N.W., Suite 300
Washington, DC 20005
Phone: (202) 289-2377
Email:   jiwata@nrdc.org

Joel R. Reynolds (*Pro Hac Vice* admission pending)
NATURAL RESOURCES DEFENSE COUNCIL
1314 2nd Street
Santa Monica, CA 90401
Phone: (310) 434-2300
Email:   jreynolds@nrdc.org

*Attorneys for Natural Resources Defense Council*

Thomas S. Waldo (AK Bar No. 9007047)
Erin Whalen (AK Bar No. 1508067)
EARTHJUSTICE
325 Fourth Street
Juneau, AK 99801
Phone: (907) 586-2751
Email:   twaldo@earthjustice.org
          ewhalen@earthjustice.org

*Attorneys for Earthworks*

# THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| SALMONSTATE, ALASKA CENTER, ALASKA COMMUNITY ACTION ON TOXICS, ALASKA WILDERNESS LEAGUE, COOK INLETKEEPER, DEFENDERS OF WILDLIFE, EARTHWORKS, FRIENDS OF MCNEIL RIVER, MCNEIL RIVER ALLIANCE, NATIONAL PARKS CONSERVATION ASSOCIATION, NATIONAL WILDLIFE FEDERATION, NATURAL RESOURCES DEFENSE COUNCIL, SIERRA CLUB, and WILD SALMON CENTER, | Case No. 3:19-cv-00267-SLG |

Plaintiffs,

v.

CHRIS HLADICK, in his official capacity as Regional Administrator of the U.S. Environmental Protection Agency, Region 10; MATTHEW Z. LEOPOLD, in his official capacity as General Counsel for EPA and under his delegated authority to perform the functions of the Administrator; U.S. ENVIRONMENTAL PROTECTION AGENCY,

Defendants.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
(Administrative Procedure Act, 5 U.S.C. §§ 702–06;
Clean Water Act, 33 U.S.C. § 1251 et. seq.)

Plaintiffs SalmonState, Alaska Center, Alaska Community Action on Toxics, Alaska Wilderness League, Cook Inletkeeper, Defenders of Wildlife, Earthworks, Friends of McNeil River, McNeil River Alliance, National Parks Conservation Association, National Wildlife Federation, Natural Resources Defense Council, Sierra Club, and Wild Salmon Center (collectively Plaintiffs or SalmonState) file this Complaint for Declaratory and Injunctive Relief, alleging:

## INTRODUCTION

1. This case challenges the U.S. Environmental Protection Agency's (EPA) decision to allow the permitting under the Clean Water Act (CWA) of what would be North America's largest open-pit gold and copper mine. The proposed Pebble Mine would industrialize the headwaters of the world's largest remaining sockeye salmon fishery. Despite finding that mining the Pebble deposit at a smaller scale than currently proposed by the Pebble Limited Partnership (PLP) could cause unacceptable adverse impacts to the pristine headwaters of Bristol Bay and concluding that protections were necessary to protect the world-class fisheries of Bristol Bay, EPA in August 2019 suddenly withdrew the protective limitations it had previously proposed. EPA's decision is arbitrary and should be vacated.

2. The Bristol Bay watershed is a 40,000 square mile area in southwest Alaska of unparalleled ecological value. Its rivers, lakes, and wetlands provide habitat for annual

salmon runs of 30 to 60 million fish that are the economic, cultural, and ecological linchpin of this region, generating $1.5 billion annually and supporting 14,000 jobs. Bristol Bay salmon have sustained Alaska Native communities, as well as a wide array of wildlife, for thousands of years. Two national park units — Lake Clark National Park and Preserve and Katmai National Park and Preserve — fall within the Bristol Bay watershed.

3.     The proposed Pebble Mine poses an unacceptable threat to the fisheries of Bristol Bay. It also poses an unacceptable and unprecedented threat to the land, water, animals, and people of Bristol Bay. The mine would destroy salmon habitat, disturb wildlife, destroy wetlands, threaten several world-class brown bear viewing areas and the tourism that depends on them, and permanently alter the way of life for those in the region that depend on salmon for food, income, and as the cultural thread that weaves through their communities.

4.     The sheer scale and magnitude of impacts places the Pebble deposit in a category all its own. PLP's current proposal is five times the worldwide median size of mines for similar deposits. Miles of salmon streams and thousands of acres of wetlands would be destroyed and thousands more significantly impacted. It is almost certain that the mine footprint — and associated impacts — will expand far beyond PLP's current proposal.

Compl. for Declaratory and Injunctive Relief                                                                   2
*SalmonState, et al., v., Hladick, et al.*, Case No. 3:19-cv-00267-SLG

5.     The proposed mine would require development of an extensive transportation corridor that would bisect the lands between Lake Clark National Park and Preserve to the north and Katmai National Park and Preserve, McNeil River State Game Refuge, and McNeil River State Game Sanctuary to the south. It would also require construction of a new deep-water port on Cook Inlet in critical habitat for endangered Cook Inlet beluga whales, ferry terminals on Lake Illiamna, and other additional infrastructure.

6.     The proposed mine has been a source of widespread concern for many, including local tribes, commercial fishing and sportsmen groups, business owners, jewelry companies, seafood processors, restaurant owners, chefs, investors, members of the faith community, environmental and conservation groups, and elected officials.

7.     The CWA gives the U.S. Army Corps of Engineers (Corps) authority to issue permits for the discharge of dredged or fill material into navigable waters of the United States. 33 U.S.C. § 1344(a). However, section 404(c) of the CWA provides EPA with the authority to deny or restrict those discharges if they would have an "unacceptable adverse effect" on the environment. *Id.* § 1344(c).

8.     If an EPA Regional Administrator has reason to believe that use of an area for disposal of dredged or fill material would cause an "unacceptable adverse effect," the Regional Administrator may notify the Corps of EPA's intent to issue "a proposed determination" that would limit discharges within that area. 40 C.F.R § 231.3(a)(1). Once

the Corps receives EPA's notice, it cannot issue permits authorizing activities within the area unless and until EPA issues a final decision under section 404(c). *Id.* § 231.3(a)(2); 33 C.F.R. § 323.6(b). However, nothing prohibits the Corps from receiving and reviewing permit applications during this period.

9.      In July 2014, after three years of scientific study, two rounds of public comment, and multiple rounds of independent external peer review, EPA's Region 10 found that "Alaska's Bristol Bay watershed is an area of unparalleled ecological value, boasting salmon diversity and productivity unrivaled anywhere in North America," and that "mining of the Pebble deposit . . . could result in significant and unacceptable adverse effects on ecologically important streams, wetlands, lakes, and ponds and the fishery areas they support." 79 Fed. Reg. 42,315, 42,315, 42,317 (July 21, 2014). Accordingly, it made a proposed determination under section 404(c) to "restrict the discharge of dredged or fill material related to mining the Pebble deposit into waters of the United States" to the extent that such discharges would result in certain losses of streams, wetlands, lakes, or ponds, or cause certain streamflow alterations (the "Proposed Determination"). *Id.* at 42,317.

10.    Despite overwhelming support for the Proposed Determination, EPA never finalized it due to a series of lawsuits filed in 2014 by PLP. EPA settled two of these lawsuits in 2017 by agreeing to consider withdrawing the Proposed Determination, which

it did by publishing a proposal in the Federal Register on July 19, 2017. 82 Fed. Reg. 33,123, 33,124 (July 19, 2017).

11.    While EPA considered its proposal to withdraw the Proposed Determination, PLP applied for a Corps permit for Pebble Mine on December 22, 2017. PLP's permit application proposed a mine larger than what the Proposed Determination found may cause unacceptable adverse effects.

12.    After receiving over a million comments, the vast majority opposing EPA's proposal to withdraw, EPA decided to leave the Proposed Determination "in place pending further consideration by the Agency of information that is relevant to the protection of the world-class fisheries contained in the Bristol Bay watershed." 83 Fed. Reg. 8668, 8668 (Feb. 28, 2018). When making this decision, then-Administrator Pruitt stated that it was his "judgment . . . that any mining projects in the region likely pose a risk to the abundant natural resources that exist [in Bristol Bay]" and until EPA "kn[e]w the full extent of that risk," Bristol Bay's resources "deserve[d] the utmost protection."[1] EPA acknowledged that the Corps' permitting process could proceed with the Proposed

_____

[1] News Release, EPA, *EPA Administrator Scott Pruitt Suspends Withdrawal of Proposed Determination in Bristol Bay Watershed, Will Solicit Additional Comments* (Jan. 26, 2018) (2018 Press Release), *available at* https://www.epa.gov/newsreleases/epa-administrator-scott-pruitt-suspends-withdrawal-proposed-determination-bristol-bay.

Compl. for Declaratory and Injunctive Relief                                                            5
*SalmonState, et al., v., Hladick, et al.*, Case No. 3:19-cv-00267-SLG

Determination in place and EPA could incorporate the permitting record into any final decision it made. 83 Fed. Reg. at 8670.

13. On or about June 26, 2019, General Counsel Leopold directed Region 10 to reconsider the decision to leave the Proposed Determination in place. Without soliciting further public comment, EPA formally withdrew the Proposed Determination in a decision signed July 30, 2019, and published in the Federal Register on August 30, 2019. 84 Fed. Reg. 45,749, 45,756 (Aug. 30, 2019). EPA's withdrawal of the Proposed Determination "constitute[s] final agency action." 40 C.F.R. § 231.5(c)(1).

14. EPA expressly disclaimed basing its decision to withdraw the Proposed Determination on whether the mine would result in "unacceptable adverse effects." 84 Fed. Reg. at 45,756. Whether a discharge will have unacceptable adverse effects is an important aspect of section 404(c) review under the CWA. Indeed, it is the single factor identified in section 404(c). EPA already started the analysis of unacceptable effects as part of both the Proposed Determination and more recently in its comments on PLP's draft permit.

15. Instead, EPA based its decision to withdraw the Proposed Determination on a fact that it had previously rejected as a basis for withdrawal: that PLP had submitted a permit application to the Corps. This submittal had already occurred when, in 2018, EPA decided to leave the Proposed Determination in place. EPA has now taken the position

that it must withdraw the Proposed Determination to evaluate new information developed as part of the Corps' permitting process and consult with the Corps over that application.

16.   This rationale does not support withdrawal. Nothing prohibits EPA from considering the factual record developed as part of the Corps' permitting process and updating its own record to reflect any changes. Similarly, nothing prohibits EPA from consulting with the Corps under the CWA while the Proposed Determination is in place. EPA acknowledged both of these facts in its 2018 decision to keep the Proposed Determination in place.

17.   EPA failed to explain why it was reversing its previous decision to leave the Proposed Determination in place.

18.   In short, EPA has failed to offer a rational explanation for withdrawing its Proposed Determination. Plaintiffs seek vacatur of EPA's decision to withdraw the Proposed Determination, along with appropriate declaratory and injunctive relief, under the Administrative Procedure Act (APA), because the decision is arbitrary, capricious, an abuse of discretion, and not in accordance with law.

## JURISDICTION AND VENUE

19.   This Court has jurisdiction over the parties and subject matter of this action pursuant to 5 U.S.C. §§ 702–06 (Administrative Procedure Act), 28 U.S.C. § 2201–02 (declaratory judgment), and 28 U.S.C. § 1331 (federal question jurisdiction).

20.   Venue is proper in the District of Alaska under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred within the District of Alaska and the waters, wetlands, and fish at issue are in Alaska.

## PARTIES

### Plaintiffs

21.   Plaintiff SALMONSTATE is an Alaska-based and Alaska-focused project of the New Venture Fund, a 501(c)(3) public charity actively supporting innovative and effective public interest projects. SalmonState works within Alaska to guarantee Alaska remains a salmon state by protecting and preserving habitat and promoting fish first policies for this irreplaceable resource. SalmonState works alongside other Alaska organizations, commercial fishermen, sport and recreational fishing guides and enthusiasts, salmon-dependent businesses, and Alaska Native organizations to maintain sustainable commercial, sport, and subsistence fisheries. SalmonState advocates for the use of the Bristol Bay watershed for commercial, sport, and subsistence fishing as well as protection of the Bay's recreation, aesthetic, and cultural resources.

22.   Plaintiff THE ALASKA CENTER is an Alaska-based nonprofit conservation group with approximately 20,000 members. By building and empowering an engaged conservation movement, The Alaska Center seeks to conserve the resources that support Alaskans' unique quality of life for current and future generations. To accomplish this,

The Alaska Center cultivates future environmental leaders, educates Alaskans about key environmental issues, and mobilizes partners and supporters to advocate for sensible conservation policies. The Alaska Center works to educate and engage Alaskans of all ages to participate in processes related to the Pebble Mine permitting. The Alaska Center believes that Alaskans should be the ones making decisions about our resources.

23. Plaintiff ALASKA COMMUNITY ACTION ON TOXICS (ACAT) is a nonprofit research and advocacy organization dedicated to protecting environmental health and achieving environmental justice in Alaska. Established in 1997, ACAT relies on community research and advocacy to change local and international toxics policy and help communities implement strategies to limit their exposure to harmful chemicals. ACAT has hundreds of supporters who contribute to the work of ACAT, some of whom who live, work, and recreate in and around the proposed Pebble Mine and otherwise enjoy the region that would be impacted by the proposed Pebble Mine.

24. Plaintiff ALASKA WILDERNESS LEAGUE is a nonprofit organization founded in 1993 with approximately 100,000 members, including many members in Alaska. Alaska Wilderness League's mission is to galvanize support to secure vital policies that protect and defend America's last great wild public lands and waters. Alaska Wilderness League advocates for the protection of Alaska's wild lands and waters and also works to prevent environmental degradation on Alaska's public lands and waters,

including the headwaters of Bristol Bay. It has offices in Anchorage and Washington, D.C., as well as other locations.

25. Plaintiff COOK INLETKEEPER is a private nonprofit organization dedicated to protecting the vast Cook Inlet watershed and the life it sustains. Since its inception in 1995, Cook Inletkeeper has relied on research, education, and advocacy to become a leader in watershed-based protections in the rich but threatened streams, lakes, and estuaries of the Cook Inlet watershed. Cook Inletkeeper has thousands of members in the Cook Inlet region, who depend on healthy fisheries and tourism businesses in Cook Inlet, both of which are threatened by the proposed infrastructure for the Pebble Mine located in Cook Inlet.

26. Plaintiff DEFENDERS OF WILDLIFE is a nonprofit organization founded in 1947. Its mission is to protect all native animals and plants in their natural communities. It advocates for the protection and restoration of imperiled species, including the Cook Inlet beluga whale, which is listed as endangered under the Endangered Species Act. Defenders of Wildlife has actively engaged in efforts to promote public awareness and understanding of the conservation status of Cook Inlet beluga whales, actions taken to conserve them, and obstacles to their recovery. The noise and habitat alteration associated with industrial activity in Cook Inlet have been identified as top threats to the recovery of Cook Inlet beluga whales, yet additional sources of noise

and habitat loss are routinely permitted in Cook Inlet with no assessment of the cumulative impact of all such sources on the potential for recovery of Cook Inlet belugas. The proposed Pebble Mine would bring substantial additional industrial activities and associated noise and habitat loss to Cook Inlet, further jeopardizing the recovery of this endangered species. Defenders of Wildlife has over 1.8 million members and supporters nationwide, including over 6,000 in Alaska. It has a headquarters in Washington, D.C. and regional field offices throughout the country, including one in Anchorage.

27. Plaintiff EARTHWORKS is a nonprofit organization dedicated to protecting communities and the environment from the adverse effects of mineral and energy development while promoting sustainable solutions. Earthworks fulfills its mission by working with communities and grassroots groups, using sound science, to reform government policies, improve corporate practices, influence investment decisions, and encourage responsible materials sourcing and consumption. Earthworks is headquartered in Washington, D.C., and has field offices across the country. Earthworks has members who live in the Bristol Bay area and rely on its abundant fisheries. Applying its special expertise in mining, Earthworks has assisted local residents throughout the section 404(c) process and in other advocacy regarding the proposed Pebble Mine since 2005.

28. Plaintiff FRIENDS OF MCNEIL RIVER is a nonprofit organization dedicated to the protection of the McNeil River State Game Sanctuary and Refuge and

the bears who use those lands. Friends of McNeil River's work varies from supporting projects within the Sanctuary to defending them from outside threats from development and other non-compatible uses.

29.   Plaintiff MCNEIL RIVER ALLIANCE is an advocacy group formed to work exclusively in support of the McNeil River State Game Sanctuary and Refuge. Especially in light of the threat posed to the Sanctuary by the proposed Pebble Mine, the Alliance is working to advocate on behalf of the Sanctuary to ensure fulfillment of the 1967 designation put in place by Alaska's legislature: "[t]he permanent protection of brown bear and other fish and wildlife populations and their habitats for scientific, aesthetic, and educational purposes."

30.   Plaintiff NATIONAL PARKS CONSERVATION ASSOCIATION (NPCA) is a 501(c)(3) nonprofit organization working to protect and enhance America's National Park System for present and future generations. NPCA was founded in 1919 and today has more than 1.3 million members and supporters. It is headquartered in Washington, D.C., and has various regional and field offices, including an Alaska Regional office in Anchorage. Among other things, NPCA works to ensure that national parks such as Lake Clark National Park and Preserve and Katmai National Park and Preserve, and their wildlife, fisheries, water quality, and other resources are protected for present and future generations.

Compl. for Declaratory and Injunctive Relief                                                12
*SalmonState, et al., v., Hladick, et al.*, Case No. 3:19-cv-00267-SLG

31. Plaintiff NATIONAL WILDLIFE FEDERATION (NWF) is the nation's largest conservation education and advocacy organization with more than six million members and supporters, and affiliate conservation organizations in 52 states and territories. NWF has an Alaska affiliate and approximately 17,900 members and supporters in Alaska. NWF has a long history of advocating for the protection, restoration, and ecologically sound management of the nation's waters and aquatic ecosystems, including the ecologically rich Bristol Bay watershed. A key part of NWF advocacy efforts involve working to improve federal decision making to protect the nation's wetlands, rivers, and estuaries and the fish and wildlife that depend on those vital resources, including the CWA and National Environmental Policy Act decisions related to the proposed Pebble Mine.

32. Plaintiff NATURAL RESOURCES DEFENSE COUNCIL (NRDC) is a nonprofit environmental membership organization with hundreds of thousands of members nationwide. Part of NRDC's core mission is to preserve the earth's wild places and wildlife, to safeguard the integrity of undeveloped lands, and to prevent the destructive impacts of extractive industry exploration and development. NRDC has been fighting to protect Bristol Bay for over a decade. NRDC has members in Alaska who live in the Bristol Bay watershed and depend on its salmon runs for food and a source of income. NRDC also has members in Alaska who regularly travel to the Bristol Bay

Compl. for Declaratory and Injunctive Relief                                          13
*SalmonState, et al., v., Hladick, et al.*, Case No. 3:19-cv-00267-SLG

watershed whose aesthetic and recreational interests would be harmed by mining in the area.

33. Plaintiff SIERRA CLUB is the nation's oldest and largest grassroots environmental organization. The Sierra Club is a national nonprofit organization with over 780,000 members dedicated to exploring, enjoying, and protecting the wild places of the Earth; to practicing and promoting the responsible use of the Earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives. The Sierra Club's concerns encompass a variety of environmental issues in Alaska and beyond, including an interest in protecting intact, pristine headwaters including those of Bristol Bay. The Alaska Chapter of the Sierra Club has just over 1,800 members.

34. Plaintiff WILD SALMON CENTER is a nonprofit organization founded in 1992. Wild Salmon Center is a science-based organization with an office in Anchorage that works to promote the conservation and sustainable use of wild salmon ecosystems across the Pacific Rim. Wild Salmon Center has staff and supporters that live and work in Alaska.

35. Plaintiffs and their members and supporters have long-standing recreational, economic, aesthetic, scientific, and cultural interests in the world-class fisheries and other

aquatic and wildlife resources of Bristol Bay and the surrounding areas. Plaintiffs'
members and supporters live near, have visited, and plan to continue visiting Bristol Bay,
the Pebble deposit area, and areas whose resources face a substantial risk of harm by the
proposed Pebble Mine.

36.  Plaintiffs and their members' and supporters' interests are adversely affected
by EPA's decision to withdraw the Proposed Determination. The Proposed
Determination prohibited the Corps from issuing a section 404 permit. The withdrawal of
the Proposed Determination removed this prohibition, clearing the path for issuance of
the permit and development of the mine.

37.  Plaintiffs and their members and supporters are reasonably concerned that
development of the Pebble deposit would harm salmon. Reflecting the vibrancy and
importance of the Bristol Bay watershed, Plaintiffs and their members and supporters
include people whose livelihoods depend on the watershed's natural resources through
commercial and subsistence fishing. Reduced salmon runs would harm the economic
interests of Plaintiffs and their members and supporters who depend on salmon as a
source of income through commercial fishing or as a source of food in lieu of expensive
groceries in a remote region. Plaintiffs and their members and supporters who
commercially fish are reasonably concerned that development of the Pebble deposit will

harm their economic interests by reducing the value of Bristol Bay salmon, which commands a premium because it is from a pristine environment.

38.    Development of the Pebble deposit would harm wildlife and generate noise and visual disturbances in the surrounding area. Plaintiffs and their members and supporters include people who regularly visit the area for hiking, boating, wildlife viewing, and quiet contemplation. An influx of construction and workers in the area would harm Plaintiffs' and their members' and supporters' aesthetic and recreational interests. Impacts on wildlife such as brown bears would harm the economic interests of Plaintiffs and their members and supporters who rely on tourism in the watershed and surrounding area for income.

39.    Plaintiffs' and their members' and supporters' actual, concrete injuries are fairly traceable to EPA's decision to withdraw the Proposed Determination and would be redressed by the relief sought in this case.

40.    Plaintiffs and their members and supporters have also opposed development of the proposed Pebble Mine in numerous other forums and by a variety of means, including, for example, testifying at hearings, meeting with legislators, holding public rallies, meeting with federal and state agencies, meeting with PLP and Northern Dynasty Minerals, and proposing state ballot measures. Plaintiffs submitted comments on the

Proposed Determination and on EPA's proposal to withdraw the Proposed Determination.

Defendants

41. Defendant CHRIS HLADICK is the Regional Administrator of Region 10 of EPA. He signed EPA's 2018 decision to leave the Proposed Determination in place. He also signed the decision to withdraw the Proposed Determination.

42. Defendant MATTHEW Z. LEOPOLD is the General Counsel for EPA. He has delegated authority from the EPA Administrator to act on behalf of EPA in decisions about the proposed Pebble Mine. The delegation was due to the voluntary recusal by the Administrator. General Counsel Leopold directed Region 10 to reconsider EPA's earlier decision to suspend the section 404(c) process. He consulted with Mr. Hladick about the decision to withdraw the Proposed Determination. Pursuant to EPA's regulations, he received notice of the withdrawal decision and allowed it to become final.

43. Defendant EPA is the federal agency responsible for implementing and enforcing a variety of federal environmental laws, including the CWA in general and section 404(c) in particular.

## STATUTORY FRAMEWORK

### The Clean Water Act

44.    Congress enacted the CWA to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To achieve this objective, Congress set up a comprehensive regulatory scheme that prohibited "the discharge of any pollutant" into navigable waters, subject to certain exceptions. *Id.* § 1311(a).

45.    The EPA Administrator has the primary responsibility to administer the CWA. Congress provided EPA with the authority and responsibility to establish regulatory criteria for issuing permits that allow for the discharge of dredged or fill material into navigable waters. *Id.* § 1344(b)(1). These mandatory criteria are referred to as the CWA section 404(b)(1) Guidelines.

46.    Congress delegated authority to issue permits for the discharge of dredged or fill material into navigable waters under CWA section 404(a) to the Corps. *Id.* § 1344(a). In its permit review, the Corps must evaluate whether an application meets the environmental criteria set forth in the CWA section 404(b)(1) Guidelines and whether an application is in the public interest. *See* 33 C.F.R. § 320 et seq.; 40 C.F.R. § 230.10.

47.    The CWA section 404(b)(1) Guidelines generally prohibit the permitting of any discharge of dredged or fill material: (1) if a practicable alternative to the proposed

discharge would have less adverse impact on the aquatic ecosystem; (2) if the discharge will cause or contribute to significant degradation of the environment; (3) if the discharge will cause or contribute to violations of water quality standards; and (4) unless all appropriate steps have been taken to minimize potential adverse impacts. 40 C.F.R. § 230.10.

48.    Consistent with EPA's oversight duties, Congress also gave EPA the authority to restrict the Corps in advance from issuing a CWA section 404 permit or to reject the Corps' decision to issue a CWA section 404 permit. Under section 404(c), Congress authorized EPA to "prohibit the specification (including the withdrawal of specification) of any defined area as a disposal site," and "to deny or restrict the use of any defined area for specification (including the withdrawal of specification) as a disposal site" whenever it determines "that the discharge of such materials into such area will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas." 33 U.S.C. § 1344(c); *accord* 40 C.F.R. § 231.1(a).

49.    EPA's regulations governing the exercise of its section 404(c) authority define "unacceptable adverse effect" as an "impact on an aquatic or wetland ecosystem which is likely to result in significant degradation of municipal water supplies (including

surface or ground water) or significant loss of or damage to fisheries, shellfishing, or wildlife habitat or recreation areas." 40 C.F.R. § 231.2(e).

50. When making a determination whether the discharge will have unacceptable adverse effects, the EPA Administrator must consider "all information available to him, including any written determination of compliance with the section 404(b)(1) Guidelines." 40 C.F.R. § 231.1(a).

51. Before exercising its section 404(c) authority to protect an area from an "unacceptable adverse effect," the Regional Administrator must give notice to the Corps of EPA's intent to issue "a proposed determination" that would limit discharges within the defined area. *Id.* § 231.3(a)(1).

52. Once the Corps receives EPA's notice, it cannot issue permits in the defined area unless and until EPA completes its process. *Id.* § 231.3(a)(2); 33 C.F.R. § 323.6(b). Nothing prohibits the Corps from receiving and processing applications for permits during this period.

53. The Regional Administrator must then provide public notice and comment for the proposed determination. 40 C.F.R. §§ 231.3(a)(2), (b)–(d); *id.* § 231.4(a).

54. After the comment period, the Regional Administrator has two options. The Regional Administrator "shall" either (1) "withdraw the proposed determination" or (2) "prepare a recommended determination [restricting use of the area as a disposal site]

because the discharge of dredged or fill material at such site would be likely to have an unacceptable adverse effect." *Id.* § 231.5(a).

55.    While the regulations impose deadlines for these actions, *see id.* § 231.5(a), the Regional Administrator can extend these timelines for "good cause." *See id.* § 231.8. Regional Administrators have commonly granted such extensions.

56.    The EPA Administrator has ultimate authority to issue a "final determination" either "affirming, modifying, or rescinding" the Regional Administrator's decision. *Id.* § 231.6. If the Regional Administrator withdraws the proposed determination and the EPA Administrator chooses not to review, the withdrawal becomes final agency action upon publication in the Federal Register. *Id.* § 231.5(c)(1).

57.    EPA may exercise its section 404(c) authority to prohibit or restrict certain discharges "whenever" it makes the required determinations, including before a permit application or after issuance of a permit.

58.    Pursuant to CWA section 404(q), EPA and the Corps have executed a Memorandum of Agreement (MOA) that sets forth procedures through which EPA can elevate its concerns about pending permit applications.[2] Congress enacted section 404(q)

----

[2] Memorandum of Agreement Between the EPA and the Department of the Army (Aug. 11, 1992), *available at* https://www.epa.gov/sites/production/files/2015-06/documents/1992_moa_404q.pdf.

Compl. for Declaratory and Injunctive Relief                                      21
*SalmonState, et al., v., Hladick, et al.*, Case No. 3:19-cv-00267-SLG

as a distinct process from section 404(c) to minimize delays in the issuance of section 404 permits. *See* 33 U.S.C. § 1344(q).

59.   If EPA believes that a permit "may result in substantial and unacceptable impacts to aquatic resources of national importance" it must send the Corps a letter during the public comment period for the draft permit. MOA at 7. EPA has 25 calendar days after sending its letter to determine whether a "discharge <u>will</u> have a substantial and unacceptable adverse impact" and notify the Corps. *Id.* If EPA concludes that a discharge will have a substantial and unacceptable adverse impact, EPA and the Corps engage in consultation. The Corps may still issue a permit if, after consultation, it disagrees with EPA. *See id.* at 8–10. Section 404(c) is the exclusive means through which EPA may prohibit discharges of dredged or fill material that it concludes would have unacceptable adverse effects.

The Administrative Procedure Act

60.   The APA requires a court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

## FACTUAL BACKGROUND

### The Pebble Deposit Sits in the Headwaters of Bristol Bay

61.   The Pebble gold and copper deposit is located in the pristine and intact headwaters of Bristol Bay in southwest Alaska. Specifically, the deposit is in the headwaters of tributaries to the Nushagak and Kvichak Rivers. These are the largest of Bristol Bay's six major river basins. The streams, rivers, wetlands, lakes, and other waters of Bristol Bay "comprise one of the most productive, pristine, valuable, and vulnerable ecosystems remaining in North America today."[3]

62.   Salmon are the lifeblood of the Bristol Bay region. It is home to the world's largest sockeye salmon fishery. This fishery generates nearly half of the world's sockeye salmon catch. Fishing is vital to the region's economy. In the summer of 2017 alone, the fishery produced 60 million wild salmon. Bristol Bay saw its highest numbers on record in 2018, recording 62.3 million wild sockeye salmon.

63.   Many of the people in the Bristol Bay region participate in a traditional culture, dependent on subsistence harvest of the fisheries and wildlife of the Bristol Bay watershed for over 4,000 years. Others rely on the fishery to support businesses based on outdoor recreation and tourism.

---

[3] Letter from Dennis J. McLerran, EPA Reg'l Adm'r, to Thomas Collier et al., CEO, PLP (Feb. 28, 2014) *available at* https://www.epa.gov/sites/production/files/2014-02/documents/bristol-bay-15day-letter-2-28-2014.pdf.

Compl. for Declaratory and Injunctive Relief                                                    23
*SalmonState, et al., v., Hladick, et al.*, Case No. 3:19-cv-00267-SLG

64. Development of the Pebble deposit threatens these resources.

### The Bristol Bay Watershed Assessment

65. Tribes from Bristol Bay submitted a petition to EPA in 2010. The petition was based on the threat posed by potential mining. It requested that EPA exercise its authority under section 404(c) of the CWA to protect the Nushagak and Kvichak watersheds from development of the Pebble deposit.

66. In response to the tribes' petition, EPA initiated a scientific assessment (Watershed Assessment).[4] The purpose was "to determine the significance of Bristol Bay's ecological resources and evaluate the potential impacts of large-scale mining on these resources." Watershed Assessment at ES–1. EPA completed the Watershed Assessment in 2014. The Watershed Assessment followed three years of rigorous scientific study. The Watershed Assessment was subject to two rounds of public comment. EPA also obtained two rounds of independent, external peer review for the Watershed Assessment.

67. Rather than evaluate the impacts of a specific mine, EPA examined the potential impacts of mining on the watershed in general using three mining scenarios.

---

[4] U.S. EPA Region 10, An Assessment of Potential Mining Impacts on Salmon Ecosystems in Bristol Bay. Alaska (2014), *available at* https://www.epa.gov/bristolbay/bristol-bay-assessment-final-report-2014.

Compl. for Declaratory and Injunctive Relief                                        24
*SalmonState, et al., v., Hladick, et al.*, Case No. 3:19-cv-00267-SLG

These scenarios were developed from preliminary proposals put forward by PLP as well as information regarding modern conventional mining technology and practices.

68. The three mining scenarios "represent[ed] different stages of mining at the Pebble deposit, based on the amount of ore processed: Pebble 0.25 (approximately .25 billion tons . . . of ore over 25 years), Pebble 2.0 (approximately 2.0 billion tons . . . of ore over 25 years), and Pebble 6.5 (approximately 6.5 billion tons . . . of ore over 78 years)." *Id.* at ES–10.

69. EPA recognized that "[t]he exact details of any future mine plan for the Pebble deposit or for other deposits in the watershed will differ from our mine scenarios." *Id.* at ES–10. However, the Watershed Assessment still provided "a baseline for understanding the potential impacts of mine development" because the three mining scenarios considered in the Watershed Assessment "realistically represent[ed] the type of development plan that would be anticipated for a porphyry copper deposit in the Bristol Bay watershed." *Id.* at ES–4, ES–10.

70. Using the three mining scenarios, EPA quantified how each scenario would result in stream and habitat loss and alter stream flow, and explained how these changes would affect wildlife. *Id.* at ES–14 to ES–15, 7–61 to 7–62. Impacts noted by the Watershed Assessment included "losses of local, unique populations" that "would erode

the population diversity that is essential to the stability of the overall Bristol Bay salmon fishery." *Id.* at 7–62.

71.    The Watershed Assessment is a sound scientific analysis. It draws well-supported conclusions.

<u>The Proposed Determination Findings</u>

72.    Based on the scientific findings in the Watershed Assessment, EPA issued a Proposed Determination under section 404(c) of the CWA on July 1, 2014. The Proposed Determination concluded that "mining of the Pebble deposit at any of [the three mining scenarios identified,] even the smallest, could result in significant and unacceptable adverse effects on ecologically important streams, wetlands, lakes, and ponds and the fishery areas they support." Proposed Determination at ES–5.

73.    EPA's notice to the Corps of the Proposed Determination prevented the Corps from issuing CWA permits in the defined area unless and until EPA withdrew the Proposed Determination. 33 C.F.R. § 323.6(b).

74.    In the Proposed Determination, EPA found that even the smallest mining scenario it considered — the 0.25 billion-ton mine — would potentially "jeopardize the long-term sustainability of these fisheries." Proposed Determination at 4–27.

75.    To avoid unacceptable adverse effects, EPA proposed restrictions on future

section 404 permits related to mining the Pebble deposit. Specifically, EPA proposed to

prohibit any discharges that would, individually or collectively, result in:

- The loss of 5 or more linear miles of streams with documented anadromous fish occurrence; or

- The loss of 19 or more linear miles of streams where anadromous fish are not currently documented, but that are tributaries of streams with documented anadromous fish occurrence; or

- The loss of 1,100 or more acres of wetlands, lakes, and ponds contiguous with either streams with documented anadromous fish occurrence or tributaries of those streams; or

- Streamflow alterations greater than 20% of daily flow in 9 or more linear miles of streams with documented anadromous fish occurrence.

*Id.* at ES–5 to ES–6. EPA derived each of these thresholds from the estimated impacts of

the 0.25 billion-ton mine scenario. *See id.*

76.    EPA recognized that using only hydrology and habitat changes within the

mine's footprint to evaluate adverse effects "underestimated" the mine's impacts. *Id.* at

ES-6. The Proposed Determination excluded from its analysis impacts from constructing

new roads, new ferry terminals, and a deepwater port along the Cook Inlet, all of which

are needed to reach the remote Pebble site. *See id.* Focusing only on hydrology and

habitat changes also excluded "impacts resulting from potential accidents and failures,"

which EPA acknowledged could occur. *Id.*

77. The Proposed Determination is based on sound science. Its proposals are

well-supported.

78. EPA received over 670,000 comments on the Proposed Determination.

Ninety-nine percent of those comments supported the Determination.

### EPA Considered Withdrawing the Proposed Determination to Satisfy its Obligations under a Settlement Agreement with PLP

79. In 2014, PLP brought three lawsuits against EPA. One of the cases was

dismissed in 2014.[5]

80. On May 11, 2017, EPA entered into a settlement agreement with PLP to

resolve the other two cases. The settlement precluded EPA from issuing a Recommended

Determination until one of two triggering events occurred: (1) the Corps issued a Final

Environmental Impact Statement (EIS) under the National Environmental Policy Act

regarding PLP's proposed permit application, or (2) 48 months from the effective date of

the settlement, whichever came first.

---

[5] *PLP v. U.S. EPA*, 155 F. Supp. 3d 1000 (D. Alaska 2014), *aff'd*, 604 F. App'x 623 (9th Cir. 2015).

Compl. for Declaratory and Injunctive Relief                                28
*SalmonState, et al., v., Hladick, et al.*, Case No. 3:19-cv-00267-SLG

81.    Neither triggering event has yet occurred. The Corps anticipates releasing a final EIS in early 2020. The 48-month period from the settlement date would expire in March 2021. The settlement allowed EPA to "use the Bristol Bay Watershed Assessment without any limitation."[6]

82.    EPA also agreed to "initiate a process to propose to withdraw the Proposed Determination."[7] EPA satisfied this obligation in full by publishing a proposal in the Federal Register in July 2017, inviting public comment on the proposal. 82 Fed. Reg. 33,123 (July 19, 2017) (Proposal to Withdraw).

83.    In the Proposal to Withdraw, EPA gave three reasons in support of withdrawing the Proposed Determination. First, it thought withdrawal would "provide PLP with additional time to submit a permit application." *Id.* at 33,124. Second, EPA believed withdrawal was needed to "remove any uncertainty, real or perceived, about PLP's ability to . . . have [its] permit application reviewed." *Id.* Finally, EPA claimed that withdrawal would "allow[] the factual record regarding any forthcoming permit application to develop." *Id.* EPA acknowledged that the Proposed Determination did not

---

[6] Settlement Agreement between EPA and Pebble Limited Partnership ¶ III.A.3 (May 11, 2017), *available at* https://www.epa.gov/sites/production/files/2017-05/documents/pebble-settlement-agreement-05-11-17.pdf.
   [7] *Id.* ¶ III.A.5.

Compl. for Declaratory and Injunctive Relief                                    29
*SalmonState, et al., v., Hladick, et al.*, Case No. 3:19-cv-00267-SLG

prohibit "PLP from filing a permit application" or the Army Corps from "process[ing] such a permit application." *Id.* at 33,123.

84. EPA limited its request for comments to these three reasons it offered for withdrawing the Proposed Determination, stating that it was not "soliciting comment on the proposed restrictions or on science or technical information underlying the Proposed Determination." *Id.*

### EPA Keeps the Proposed Determination in Place Pending Further Analysis of Mining Impacts Based on Environmental Concerns

85. EPA received more than one million comments on the proposal to withdraw the Proposed Determination. An overwhelming majority of those comments opposed withdrawal of the Proposed Determination.

86. On December 22, 2017, while the Proposed Determination was still in place, PLP submitted a permit application to the Corps proposing a 1.2 billion-ton mine. The tonnage of ore in PLP's proposed mine was nearly five times the 0.25 billion-ton mine that EPA found could cause unacceptable adverse effects in the Proposed Determination.

87. On January 26, 2018, then-Administrator Pruitt stated that EPA was "suspending its process to withdraw" the Proposed Determination because it was his "judgment . . . that any mining projects in the region likely pose a risk to the abundant natural resources that exist [in Bristol Bay]." 2018 Press Release. The Proposed Determination was to stay in place "[u]ntil [EPA] know[s] the full extent of that risk,"

Compl. for Declaratory and Injunctive Relief                                        30
*SalmonState, et al., v., Hladick, et al.*, Case No. 3:19-cv-00267-SLG

because Bristol Bay's "natural resources and world-class fisheries deserve the utmost protection." *Id.*

88.    Administrator Pruitt indicated that the suspension of the withdrawal was based on EPA's "serious concerns about the impacts of mining activity in the Bristol Bay Watershed" and because "for EPA not to express an environmental position at this stage would be disingenuous." *Id.* PLP's application for a permit, Administrator Pruitt reasoned, "must clear a high bar, because EPA believes the risk to Bristol Bay may be unacceptable." *Id.*

89.    Administrator Pruitt concluded that EPA should continue to gather information before taking further action: "EPA intends to solicit additional public comment on the impact of the mining application on the existing proposed determination to better inform that analysis." *Id.*

90.    Region 10 Administrator Chris Hladick signed the formal decision declining to withdraw the Proposed Determination. 83 Fed. Reg. 8668, 8668 (Feb. 28, 2018) (Suspension Decision). The Suspension Decision acknowledged that the reasoning in EPA's earlier proposal did not support withdrawing the Proposed Determination.

91.    The Suspension Decision acknowledged that the Proposed Determination was not an impediment to either PLP submitting a permit application or the Corps reviewing that application. *See id.* at 8670. PLP had already submitted its permit

application. *Id.* The Corps' regulations allowed the Corps to review that application while a proposed determination was in place. *Id.*

92.   The Suspension Decision also concluded that EPA did not need to withdraw the Proposed Determination to allow for the permit application's factual record to develop. *Id.* EPA explained that it could incorporate the Corps' permitting record into any final decision it made regarding the Proposed Determination. "EPA has discretion to consider that factual record after it has been further developed before Region 10 determines whether to forward a signed Recommended Determination to EPA Headquarters and, if such a decision is made, to determine the contents of such a Recommended Determination." *Id.*

93.   Based on these findings, the Suspension Decision concluded that EPA would leave the Proposed Determination in place "pending consideration of any other information that is relevant to the protection of the world-class fisheries contained in the Bristol Bay watershed in light of the permit application that has now been submitted to the Corps." *Id.*

94.   The Suspension Decision also stated that EPA intended to "solicit public comment on what further steps, if any, the Agency should take under Section 404(c) to prevent unacceptable adverse effects to the watershed's abundant and valuable fishery resources in light of the permit application." *Id.* at 8668.

95. The Suspension Decision acknowledged that EPA's regulations set deadlines to either withdraw the Proposed Determination or make a Recommended Determination, but found "good cause" for an extension. *Id.* at 8671. EPA explained additional time was warranted "to allow for an additional public comment period and to align with the timeframes established in the settlement agreement," which limited EPA's ability to issue a Recommended Determination until the Corps issued its final EIS. *Id.*

96. The permitting process continued to develop following the Suspension Decision. In December 2018, PLP submitted a revised permit application for an even larger mine, which would extract 1.44 billion tons of ore over 20 years. In February 2019, the Corps issued a Draft Environmental Impact Statement based on that proposal.

97. The mine proposed by PLP would cause or contribute to significant degradation of the streams and wetlands in the vicinity of the proposed mine.

98. The mine proposed by PLP would result in significant damage to Bristol Bay fisheries.

99. The mine proposed by PLP would have unacceptable adverse effects on Bristol Bay fisheries.

<u>EPA Withdraws the Proposed Determination Despite Expressing Significant Concerns About the Corps' Environmental Analysis</u>

100. Governor Dunleavy sent a letter dated March 1, 2019, to President Trump objecting to the use of the "preemptive veto" in Alaska, stating that it "handicapped"

Compl. for Declaratory and Injunctive Relief 33
*SalmonState, et al., v., Hladick, et al.*, Case No. 3:19-cv-00267-SLG

natural resource development, and citing the proposed Pebble Mine as the "poster child."[8]

101. In an undated memo issued on or about June 26, 2019, General Counsel Leopold directed Region 10 to resume its consideration of whether to withdraw the 2014 Proposed Determination. General Counsel Leopold asserted that the Suspension Decision created "confusion" and that "lifting the suspension is appropriate."[9] The memorandum came after multiple meetings between President Trump and Governor Dunleavy. EPA released the memorandum publicly on the same day President Trump and Governor Dunleavy met in Alaska. At this meeting, they discussed the proposed Pebble Mine.

102. Nonetheless, EPA continued to express concerns about the environmental impacts of mining the Pebble deposit and the Corps' permitting process. On July 1, 2019, EPA submitted comments to the Corps about its draft EIS for PLP's permit application.

---

[8] Letter from Michael J. Dunleavy, Governor of Alaska, to Donald J. Trump, President of the United States (Mar. 1, 2019), *available at* https://www.eenews.net/assets/2019/07/23/document_gw_01.pdf.

[9] Memorandum re Resuming consideration of the withdrawal of the July 2014 Proposed Determination to restrict use of the Pebble Deposit Area as a disposal site, from Matthew Z. Leopold, U.S. EPA Gen. Counsel, to Chris Hladick, Reg'l Admin., Reg. 10, U.S. EPA (June 2019), *available at* https://www.epa.gov/sites/production/files/2019-06/documents/pebblemine508.pdf.

EPA's comments[10] concluded that PLP's proposed project "may have substantial and unacceptable adverse impacts on fisheries resources in the project area watersheds, which are aquatic resources of national importance." EPA CWA Comments at 55. The comments also stated that EPA's "review finds that the [Corps'] . . . documents do not contain sufficient information . . . to make a reasonable judgment that the proposed discharges will comply with the [CWA] Guidelines." *Id.* at 12. As a result, "EPA has concerns regarding the extent and magnitude of the substantial proposed impacts to streams, wetlands, and other aquatic resources that may result, particularly in light of the important role these resources play in supporting the region's valuable fishery resources." *Id.* at 55. EPA also noted that the Corps' draft EIS "likely underestimates the extent, magnitude, and permanence of the adverse effects." *Id.* at 12.

103. Because it found that the proposed permit "may have substantial and unacceptable adverse impacts," EPA initiated the process to begin consultation with the Corps pursuant to the section 404(q) MOA. *Id.* at 55. EPA acknowledged that "the standard set out in the [section 404(q) memorandum] is similar to the Section 404(c)

---

[10] U.S. EPA, Comments Submitted by the U.S. Environmental Protection Agency (EPA) in Response to the U.S. Army Corps of Engineers (Corps) Public Notice POA-2017-00271, the Pebble Limited Partnership (PLP) (2019) (EPA CWA Comments), *available at* https://www.epa.gov/sites/production/files/2019-07/documents/epa-comments-draft-404-permit-pebble-project-07-01-2019_0.pdf.

Compl. for Declaratory and Injunctive Relief                                    35
*SalmonState, et al., v., Hladick, et al.*, Case No. 3:19-cv-00267-SLG

standard." *Id.* Based on the MOA, EPA's determination meant that it had 25 days to notify the Corps about whether the proposed permit "will have a substantial and unacceptable impact," which would trigger consultation requirements between the Corps and EPA. MOA at 7–8. Even if EPA made this finding, however, the Corps could still issue the permit despite EPA's concerns. *See id.* at 8–10.

104. Despite the extensive analysis contained in the Proposed Determination and its recent comments, EPA claimed it could not conclude whether the proposed permit would have substantial and unacceptable impacts. On July 25, 2019, General Counsel Leopold requested the Corps grant EPA an extension that would allow EPA to first evaluate the Corps' preliminary drafts of the section 404 permit.[11] Shortly thereafter, the Corps agreed to give EPA an extension until October 24, 2019, which is well before the Corps would circulate preliminary drafts.[12]

105. On July 30, 2019, EPA announced on its website that it was withdrawing its Proposed Determination. EPA formally withdrew the Proposed Determination on August

_____

[11] *See* Letter from Matthew Z. Leopold, U.S. EPA Gen. Counsel, to the Hon. R.D. James, Assistant Sec'y of the Army 2 (July 25, 2019), *available at* https://www.epa.gov/sites/production/files/2019-07/documents/bristol-bay-404q-90day-extension-request-7-26-2019.pdf.
[12] *See* Letter from R.D. James, Assistant Sec'y of the Army, to Matthew Z. Leopold, U.S. EPA Gen. Counsel (Undated), *available at* https://www.epa.gov/sites/production/files/2019-07/documents/bristol-bay-404q-90day-extension-corps-response-7-26-2019.pdf.

Compl. for Declaratory and Injunctive Relief                                    36
*SalmonState, et al., v., Hladick, et al.*, Case No. 3:19-cv-00267-SLG

30. 84 Fed. Reg. 45,749 (Aug. 30, 2019). That withdrawal is final agency action. *See* 40 C.F.R. § 231.5(c)(1).

106. EPA provided two grounds for its decision to withdraw the Proposed Determination.

107. First, EPA found that the Proposed Determination's record was "stale" at five years old and that any section 404(c) action should incorporate the Corp's permitting record. 84 Fed. Reg. at 45,752–53. EPA also claimed that some of the conclusions in the Proposed Determination conflicted with the Corps' findings in its draft EIS and that it believed EPA should look to the "full available record" to resolve those potential inconsistencies. *Id.* at 45,754.

108. Second, EPA stated that "there are other processes available now, including the 404(q) MOA process, for EPA to resolve any issues with the Corps as the record develops" *id.* at 45,753, and the consultation process "is most appropriate . . . to address concerns as the record develops rather than continue with a separate 404(c) action initiated in 2014." *Id.* at 45,755.

109. EPA also reversed its previous finding that there was good cause to extend its section 404(c) regulatory deadlines to align with the Corps' permitting process. EPA found that the good-cause exception did not "allow for long-term gaps . . . that could result in decision-making without the full record." *Id.* at 45,753.

Compl. for Declaratory and Injunctive Relief          37
*SalmonState, et al., v., Hladick, et al.*, Case No. 3:19-cv-00267-SLG

110. EPA expressly disclaimed that its withdrawal decision was based on "technical consideration or judgments about" the proposed mine's environmental impacts, including whether it would result in "unacceptable adverse effects." *Id.* at 45,756. EPA stated that it was "not seeking to resolve any conflicting preliminary conclusions of the Agencies or conclusively address the merits of the underlying technical issues." *Id.* at 45,754.

111. EPA did not request further public comment before withdrawing the Proposed Determination. Instead, EPA stated that "its July 2017 notice" regarding the initial proposal to withdraw the Proposed Determination was sufficient. *Id.* at 45,756 (citing 40 C.F.R. § 231.5(c)). EPA also stated that it is "unnecessary to seek additional public comment as indicated by the February 2018 Federal Register notice" because EPA had "provided numerous opportunities for the public to comment on the Bristol Bay Watershed Assessment and Proposed Determination, including on the rationale for EPA's decision to withdraw the Proposed Determination" and there were opportunities to comment on the Corps' permit. *Id.*

112. While the Proposed Determination was in place, the Corps could not issue a section 404 permit to PLP. *See* 33 C.F.R. § 323.6(b). With the withdrawal of the Proposed Determination, this restriction is lifted. *See id.*

Compl. for Declaratory and Injunctive Relief                                    38
*SalmonState, et al., v., Hladick, et al.*, Case No. 3:19-cv-00267-SLG

113. The Corps expects to issue a decision on PLP's section 404 permit application in the summer of 2020.

## FIRST CLAIM

### EPA Failed To Consider Relevant Factors
### (33 U.S.C. § 1251 et seq. and 5 U.S.C. § 706)

114. The Clean Water Act authorizes EPA to restrict discharges of dredged or fill material if they would "have an unacceptable adverse effect on" various resources, including "fishery areas." 33 U.S.C. § 1344(c); *see also* 40 C.F.R. § 231.1(a). In withdrawing the Proposed Determination, EPA failed to consider whether the proposed discharges would have unacceptable adverse effects. In fact, EPA explicitly disclaimed withdrawing the Proposed Decision based on whether there would be unacceptable adverse effects.

115. EPA's decision to withdraw the Proposed Determination neither acknowledges nor considers its substantive findings that development of the Pebble deposit — even at a scale smaller than that currently proposed by PLP — may have unacceptable adverse effects.

116. EPA's July 19, 2017 public notice stated that the agency was "not soliciting comment on the proposed restrictions or science or technical information underlying the Proposed Determination." 82 Fed. Reg. at 33,124. When withdrawing the Proposed

Compl. for Declaratory and Injunctive Relief                                          39
*SalmonState, et al., v., Hladick, et al.*, Case No. 3:19-cv-00267-SLG

Determination, EPA stated that such information "remain[s] outside the bounds of EPA's basis for its decision." 84 Fed. Reg. at 45,756.

117. EPA's withdrawal of the Proposed Determination had the legal effect of removing a barrier to the Corps' issuance of a permit. *See* 33 C.F.R. § 323.6(b). Yet EPA continued to have concerns about potentially unacceptable adverse effects from the proposed mine.

118. Whether the project poses unacceptable adverse effects is an important aspect of section 404(c) review under the CWA. EPA's failure to consider that factor before withdrawing the Proposed Determination is arbitrary, capricious, and not in accordance with the CWA.

## SECOND CLAIM

**EPA's Withdrawal Decision Is Not Supported by the Record and EPA Failed to Acknowledge and Explain Its Reversal**
**(33 U.S.C. § 1251 et seq. and 5 U.S.C. § 706)**

119. EPA withdrew the Proposed Determination because (1) "there is new information that has been generated since 2014," and (2) "there are other processes . . . , including the 404(q) MOA process, for EPA to resolve any issues with the Corps as the record develops." 84 Fed. Reg. at 45,753.

120. These reasons are arbitrary and contradict EPA's prior findings. EPA has not articulated a rational connection between the availability of new information and its

Compl. for Declaratory and Injunctive Relief             40
*SalmonState, et al., v., Hladick, et al.*, Case No. 3:19-cv-00267-SLG

decision to withdraw the Proposed Determination. Nor has EPA articulated a rational connection between the availability of the section 404(q) consultation process and its decision to withdraw the Proposed Determination. EPA has failed to provide a reasoned explanation for withdrawing the Proposed Determination.

121. EPA's decision to withdraw the Proposed Determination based on the existence of new information is arbitrary. As EPA previously acknowledged in the Suspension Decision, EPA's regulations allow it to incorporate the Corps' permitting record into the Proposed Determination's existing record. *See* 83 Fed. Reg. at 8670; *see also* 40 C.F.R. § 231.5(e)(4)–(5) (EPA's record includes the Corps' record and any other relevant information). EPA never explains why its original conclusion was wrong. Nor does EPA explain why it should withdraw the Proposed Determination instead of incorporating new information into its record.

122. EPA's decision to withdraw the Proposed Determination because there is a section 404(q) process underway is also arbitrary. Nothing in the CWA regulations, statute, or guidance precludes EPA from moving forward with the section 404(q) consultation process while the Proposed Determination is in place. EPA's rationale is contrary to the position it took in the Suspension Decision that it would not withdraw the Proposed Determination without factual analysis about  the proposed Pebble Mine's unacceptable adverse effects given the agency's concerns and the importance of the

affected resources. In deciding to keep the Proposed Determination in place, Administrator Pruitt stated that Bristol Bay's "natural resources and world-class fisheries deserve the utmost protection." The 404(q) process, which gives the Corps the final say despite whatever concerns EPA expresses about substantial and unacceptable impacts to aquatic resources, does not provide "the utmost protection" to those resources. EPA has failed to provide a reasoned explanation for this reversal.

123. EPA's decision to withdraw the Proposed Determination is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706.

124. EPA's failure to provide a reasoned explanation for its reversal in agency position is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706.

## **REQUEST FOR RELIEF**

The Plaintiffs request that the Court grant the following relief:

A.      Under 28 U.S.C. § 2201 and the APA, declare that EPA's withdrawal of the Proposed Determination is arbitrary, capricious, an abuse of discretion, and not in accordance with the CWA;

B.      Vacate and set aside EPA's withdrawal of the Proposed Determination;

C.      Enter appropriate injunctive relief;

Compl. for Declaratory and Injunctive Relief                                                    42
*SalmonState, et al., v., Hladick, et al.*, Case No. 3:19-cv-00267-SLG

D.      Award the Plaintiffs all reasonable costs and attorney's fees as authorized

by law; and

E.      Award the Plaintiffs such other relief as this Court deems just and proper.

Respectfully submitted this 9th day of October, 2019,


*s/* Katherine Strong
Katherine Strong (AK Bar No. 1105033)
Brian Litmans (AK Bar No. 0111068)
TRUSTEES FOR ALASKA

*Attorneys for SalmonState, Alaska Center, Alaska Community Action on Toxics, Alaska Wilderness League, Cook Inletkeeper, Defenders of Wildlife, Friends of McNeil River, McNeil River Alliance, National Parks Conservation Association, National Wildlife Federation, Sierra Club, and Wild Salmon Center*


*s/* Jacqueline M. Iwata (consent)
Jacqueline M. Iwata (*Pro Hac Vice* admission pending)
Joel R. Reynolds (*Pro Hac Vice* admission pending)
NATURAL RESOURCES DEFENSE COUNCIL

*Attorneys for Natural Resources Defense Council*


*s/* Thomas S. Waldo (consent)
Thomas S. Waldo (AK Bar No. 9007047)
Erin Whalen (AK Bar No. 1508067)
EARTHJUSTICE

*Attorneys for Earthworks*